IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

EARL BURDETTE
and CORNELIA FAYE PETTIS                                              PLAINTIFFS

VS.                                                  CAUSE No. 3:13-cv314-MPM-SAA

PANOLA COUNTY, MISSISSIPPI,
By and through its BOARD OF SUPERVISORS;
PANOLA COUNTY SHERIFF DENNIS DARBY
IN HIS INDIVIDUAL CAPACITIES
And JOHN DOES 1-10                                                    DEFENDANTS

**PLAINTIFFS' RESPONSE IN OPPOSITION TO THE
DEFENDANTS' MOTION FOR SIMMARY JUDGMENT**

Plaintiffs Earl Burdette and Cornelia Faye Pettis files this Memorandum in Response to the Defendants' Motion for Summary Judgment. In support thereof, they state as follows:

**A. INTRODUCTION**

This case started with a shooting at the Como Apartments in Como, Mississippi, on November 14, 2013.[1] Earl Burdette is the police chief of Como. At the time the shooting was reported, Burdette was off duty in Batesville. When he got a call about the shooting from his Assistant Chief Cornelia Faye Pettis, Burdette told Pettis he was headed that way. En route, Burdette called Peter Clinton of the Mississippi Bureau of Investigation to ask for his help. When he finally got in touch with Clinton, Clinton promised to send Agent Heath Farish to

---

[1] The shooting that sparked the events at the center of this lawsuit started as an argument between two men over one of them disrespecting a third, mentally challenged man. One of the men retrieved a gun, a scuffle ensued and a fourth man was accidentally shot in the leg. *Aff. of Tracy Wilbourn, Ex. A*. Eventually the man who brought the gun to the argument ran off. The other man and two witnesses, including Tracy Wilbourn, retrieved the gun and took it to the police station but the police station in this small town was closed. They took the gun to a relative's house and called Assistant Police Chief Faye Pettis to tell her what had happened. *Id; Pettis Aff. Ex. B*. She told them to go back to the apartments where the shooting happened and she would meet them there. *Tracy Wilbourn Aff. Ex. A; Pettis Aff. Ex. B*.

assist. *Burdette Aff. Ex. E.*

Before going to the crime scene, Burdette checked in at the Como Police Station and waited for Farish to arrive. After waiting approximately 40 minutes, Burdette called Clinton who told Burdette that Farish had turned around when requested to do so by Panola County Sheriff Dennis Darby. *Id.*

*The relationship between Burdette and Darby:*

A little background is in order here. Darby became sheriff in 2011 when he defeated Otis Griffin, the incumbent. Burdette had been a deputy in the Panola County Sheriff's Department for many years, most of those serving Otis Griffin. When Dennis Darby took office, Darby ordered Burdette to not communicate with Otis Griffin or Griffin's former secretary notwithstanding the fact that Burdette had been friends with these people for many years. Burdette ended up leaving the sheriff's department and was offered the job as police chief of Como, a municipality of some 1200 in Panola County.

Prior to Burdette being offered the job as police chief of Como, Darby told the mayor of Como that if he hired Burdette, Como could not expect Darby's office to back up the Como Police Department. *Dishmon Aff. Ex. C.* Como hired Burdette anyway. Burdette then asked the sheriff of neighboring Tate County whether Tate County would house Como arrestees and whether Tate County would provide back up to the Como P.D. Tate County Sheriff Brad Force agreed.

Burdette also contacted Peter Clinton at the Mississippi Department of Public Safety's Bureau of Investigation who also promised to provide backup as needed. *Clinton Memorandum Ex. DD.* On October 25, 2013, Burdette called Clinton to tell him that the "word on the street" was that Burdette needed to watch his back. Chief Burdette advised Clinton that he was concerned for his personal safety and that if anything happened to him he wanted MBI to

investigate the case. *Id, See also Aff. Of Charlie Henson Ex. K.*

Suffice it to say that Burdette and Darby did not have a close, personal relationship, working or otherwise.

*Back to the investigation of the shooting:*

On November 14, 2013, when Clinton informed Burdette that Agent Farish had been told to back down by Darby, Burdette asked Clinton to intercede and have Farish come to Como anyway. When Farish arrived at Como PD headquarters, Assistant Chief Pettis informed Farish of the facts she had gathered thus far. She also printed off a picture of the shooter. Burdette, Pettis and Farish proceeded to the scene of the shooting.[2] When they arrived, they found Darby and about fifteen sheriff's deputies standing at a spot some fifty yards from the scene of the shooting. When they got back to the apartments, there were a lot of law enforcement officers there including Chief of Police Burdette and Assistant Police Chief Pettis. Sheriff's deputies were gathered at a spot some twenty yards away. *Tracy Wilbourn Aff. Ex. A.* Chief Burdette asked Wilbourn's mom if he could take Wilbourn to the station and talk to him there and Wilbourn's mother gave permission. *Id.* As they started to leave in Burdette's car, Sheriff Darby opened the front passenger door, grabbed Wilbourn by the shirt, and stated "this is my witness." Burdette drove off causing Darby to lose his grip. *Id.; Burdette Aff. Ex. E; Pettis Aff. Ex. B;.* This was witnessed by several persons including Vivian Towns[3], Lillian Towns,[4] and Renzell Oliver. *Oliver aff. Ex. H.* It was also witnessed by Mississippi Department of Corrections Officer Jared Tucker. Tucker states that as Burdette drove off, he heard someone say "He tried

---

[2] Pettis had already visited the scene of the crime, interviewed the victim (who identified his assailant but also said that the shooter wasn't trying to shoot him), collected evidence and took photos. *Pettis Aff. Ex. B.* Pettis advised sheriff's deputies on the scene that they were not needed, that MBI had agreed to handle the investigation. *Id.*

[3] Ex. F.

to run over the Sheriff," but that this is not what happened. *See Tucker aff. Ex. I.* As Darby and MBI Investigator Danny Beaver walked toward their vehicles, Darby approached Assistant Police Chief Pettis and stated "I'm going to have him locked up." *Id.*

*Inside the Como Police Station:*

Back at the police station, Burdette was planning to question Wilbourn about the shooting when Darby appeared at the station with Deputy Emily Griffin. *Burdette Aff. Ex. E; Pettis Aff. Ex. B.* Burdette told Darby he could not come inside and reached for a can of mace. *Burdette's Aff. Ex. E.* Darby then pushed Burdette in the chest and a scuffle ensued with Griffin joining in by jumping on Burdette's back. *Burdette Aff. Ex. E; Pettis Aff. Ex. B; Laverne WIlbourne Aff. Ex. J.* A brief scuffle ensued during which Burdette dropped the mace. When it was over he picked the mace up and put it on a desk whereupon Darby snatched it up and placed it in his pocket. As other deputies entered the station, Darby kept repeating that he was sheriff and he wanted the witness with Deputy Danny Beavers insisting that the sheriff could do that. *Burdette's Aff. Ex.E.*

MBI agent Farish suggested that the questioning be done at an MBI office with both the Police Chief and the Sheriff present, but Wilbourn's mother Lavern Wilbourn insisted that her son was not going anywhere. *Burdette's Aff. Ex.E.* Burdette assured her that he would be there and she finally gave her consent but insisted she only wanted Burdette and Pettis questioning him. *Id.* Burdette then told Darby to return the mace. At that point Darby and his deputies (Chris Franklin, Danny Beavers, Emily Griffin) pinned Burdette to the desk and began pummeling him while Darby himself reached for Burdette's gun. *Burdette Aff. Ex. D; Pettis Aff. Ex. B; Laverne Wilbourn Aff. Ex. J; Tracy Wilbourn Aff. Ex. A.* Griffin jumped up on the desk and began to stomp Burdette on the chest. Burdette, outnumbered, stopped struggling

---

[4] Ex. G.

whereupon he was placed in handcuffs. Deputies John Still and Jason Chrestman pinned Pettis's arms behind her back. *Id.* Burdette was taken from the station in handcuffs. Darby approached Pettis and told her she was going to jail as well and he tried to take her gun but it was securely fastened. *Pettis Aff. Ex. B.* John Still was getting ready to handcuff Pettis when Chris Franklin said to let her go because they got the one they wanted. *Id.*

Burdette was placed in the back of a sheriff deputy's vehicle and driven to the Panola County jail where he was placed in a conference room for three hours and not allowed to leave. Eventually a deputy told him to report to the back of the jail where someone would pick him up and drive him to Como.

*The lawsuit:*

Burdette and Pettis filed suit alleging the following causes of action: deprivation of civil rights under 42 USC Sect. 1983, a conspiracy to interfere with civil rights pursuant to 42 USC Sect. 1985, a policy, plan custom usage or practice of using unreasonable force and failure to train, intentional infliction of emotional distress, and unlawful detention.

The Defendants have moved to dismiss claiming that the primary issue here is whether Mississippi law gives a sheriff "superior jurisdictional authority over the investigation of a potential state law felony charge in his county." *Defendants' Memorandum p. 1.* But that misses the point. The thrust of the Plaintiffs' complaint is that there were assaulted and unlawfully detained and the victims of excessive force. Because these actions were done by the sheriff and his deputies while on duty, the claims are couched as various civil rights claims (as well as state law claims for intentional infliction of emotional distress). But regardless of who had superior authority to investigate the shooting that touched off Sheriff Darby's invasion of the Como police station, the Sheriff and his underlings did not have authority to beat up and detain Chief

Earl Burdette and Assistant Chief Cornelia Fay Pettis. The question of "who had superior authority" is a classic red herring. The Defendants maintain that they had cause to arrest both Burdette and Pettis claiming that 1) Burdette dragged the sheriff with his car[5] and/or 2) Burdette assaulted Darby in the Como Police Station. *Defendants' Brief p. 10.* Burdette and Pettis deny that Burdette ever assaulted anyone. They claim that they were detained for no reason (other than that Darby wanted "his" witness) and that Darby and his crew assaulted Burdette. Despite the fact that there is an audiotape of the events at the Como Police Station, it does not prove either parties' contentions. Because there are disputed issues of material fact, summary judgment must be denied.

### A. STANDARD FOR GRANTING SUMMARY JUDGMENT:

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bel. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir.2000) citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After a properly supported motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts supported by summary judgment evidence showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 LEd.2d 202 (1986); *Beck*, 204 F.3d at 633; *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tennessee Gas Pipeline Company,* 136 F.3d 455, 458 (5th Cir. 1998). Substantive law determines what is material. *Anderson*, 477 U.S. at 249. "Only disputes over

---

[5] Defendants' Brief p. 6.

facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex*, 477 U.S. at 327.

"Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Federal Savings and Loan Ins. v. Kralj,* 968 F.2d 500, 503 (5th Cir. 1992) citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574. 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The facts are reviewed drawing all reasonable inferences in favor of the nonmoving party. *Allen*, 204 F.3d at 621; *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.*, 1ll F.3d 351, 161 (5th Cir. 1999); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1 187, 1198 (5th Cir. 1995). "However, unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Nuwer v. Mariner Post-Acute Network*, 332 F.3d 310, 313 (5th Cir. 2003) (internal citations omitted).

B. **LAW AND ARGUMENT:**

1. **First of all, the audiotape does not end the inquiry inasmuch as the audiotape merely indicates that there were two altercations inside the Como Police Station but not what caused them.**

The Defendants argue that because there is an audiotape, there can be no questions of material fact since the audiotape controls. This is certainly true where there is a videotape of the incident at issue and the videotape clearly contradicts whatever version of events the plaintiff is asserting. The cases cited by Defendants, *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed2d 686 (2007), and *Foster v. Carroll County,* 502 Fed.Appx 356, 358 (5th Cir. 2012), both involve a videotape that completely contradicts the plaintiff's version of the facts. In this case,

7

the Defendants argue that an audiotape of the events inside the Como Police Station lays out the full story of what happened therein.

> The audio is clear and fully supports the arrest of Chief Burdette by the Panola County Sheriff's Department. Chief Burdette refused to turn over a witness after Sheriff Darby had already commenced an investigation, eventually speeding away with the witness while dragging the Sheriff several feet. Burdette made threats to officers. Burdette pushed Deputy Danny Beavers. Burdette ordered Assistant Chief Pettis to pepper spray the deputies. Master Sergeant Farish calmed the situation, however, Chief Burdette re-escalated the situation by reaching for pepper spray which was in the pants pocket of Sheriff Darby. Chief Burdette was then wrestled to the ground, disarmed, placed in handcuffs and was not free to leave.

*Defendants' Brief at p. 5.* The authority for this recitation of "facts", however, is not the audiotape but rather the incident report prepared by Agent J. Farish. The audios provided by the Defendants are Defendants' Ex. R which is nothing more than the dispatch calls regarding the shooting and Defendants' Ex. Q which is a tape made by Emily Griffin which starts just before she and Darby enter the police station.

Griffin begins the tape by announcing that they are going to talk to Chief Burdette because he took one of our witnesses from the scene. "Burdette just ran off with the witness." Darby can be heard in the background stating the same thing.[6] In fact, Darby can be heard in the background saying "I may may may just have to be fixing to arrest him there." The "him" Darby is referring to appears to mean Chief Burdette since the next few statements Darby makes on the tape refer to Burdette and Darby ended up arresting Burdette and not Wilbourn. Notably, neither Griffin nor Darby mentions that Burdette dragged Sheriff Darby or struck Danny Beavers even though Defendants contend throughout their brief that Burdette dragged Sheriff Darby and

---

[6] Apparently Darby is calling his deputies to have them meet him at the Como Police Station. Just before they enter the station, it sounds like Darby is asking Griffin whether she has any mace and she responds that she "ain't got shit other than a damn gun." *Defendants' Ex. Q at 1:19*.

8

struck Beavers when he left the scene of the shooting. Indeed, Griffin, some sixteen minutes into the tape claims she introduced the tape with this information but there is no mention in the beginning of the tape that Burdette dragged the Sheriff or hit a deputy and that this is the reason they are going to get Burdette. The beginning of the tape makes clear that the sheriff and his deputies are going to the Como Police Station because Chief Burdette took their witness and they are going to get him back even of they have to arrest the chief of police to do so.

The Defendants describe the beginning of the first altercation as Burdette cursing and saying "get your damn hands off me" which corroborates Burdette's story that the sheriff's people initiated the scuffle. *Defendants' brief p. 2.* Meanwhile Emily Griffin can be heard shouting over and over again "this is our witness, this is our witness." It also clear from the audio that the witness, Tracy Wilbourn, is insisting that he will only speak to Faye Pettis.[7] Moreover, the audiotape also corroborates that it was Faye Pettis who was trying to calm the entire situation and that there was a dispute about the mace. It is also clear that at some point after the first scuffle, Griffin, who is the one with the taping device, steps away from the others (with another person) and only reenters after the second altercation has started so the audio doesn't even capture what happened just before Chief Burdette was handcuffed.[8]

If the Defendants had a videotape of what happened in the Como Police Station that afternoon, that may well have settled once and for all what happened that day for the purposes of this lawsuit (although it might not have given the number of law enforcement officers involved which would probably make it difficult to see). But the videotape does not prove that

---

[7] This occurs approximately three minutes into the tape. *Defendants' Ex. Q.* Griffin goes into another room or outside, noises of an altercation are heard in the background and Griffin is heard saying "Oh shit" and she heads towards the noise.
[8] This occurs at about 6:50. *Defendants' Ex. Q.* In between scuffles, there is arguing over whose witness Wilbourn is, who started what, etc.

9

the actions of the Sheriff and his deputies in assaulting Chief Burdette and arresting him (and detaining Assistant Chief Pettis) were justified by anything Chief Burdette did. As a matter of fact, it seems to show that Sheriff Darby set out for the Como Police Station with the idea that he might have to arrest Chief Burdette in order to retrieve "his" witness. So, Defendants' contention that summary judgment must be granted for them because of what is on the audiotape is meritless.

2. **Secondly, the issue of who had superior authority over the investigation is a red herring.**

Defendants argue that the Sheriff's department had authority above and beyond that of the Como P.D. to investigate the shooting even though it happened inside the city limits of Como. But that Como had first dibs on the shooting is reflected in the Defendants' recitation of the facts. On page one of the Defendants' Memorandum: "The facts are well documented. An emergency call came in to Panola S.O. [Dispatcher Rose Wilson]. [Exhibit K]. Wilson first attempted to reach Assistant Faye Pettis of Como P.D. but was unsuccessful." *Defendants' Brief pp. 1-2 (emphasis added).*

Second of all, the case cited by the Defendants, *McMillian v. Monroe County*, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997), has zero application here. In *McMillian*, the United States Supreme Court addressed the issue of whether the sheriff worked for the state of Alabama for the purposes of Eleventh Amendment immunity. In so doing, the Court acknowledged that the determination of whether the sheriff was employed by the state or some lesser governmental entity depended on the statutory scheme of the individual state. "Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties" and, thus, are immune from suit in federal court under the Eleventh Amendment. *McMillian*, 520 U.S. at 793. Mississippi sheriffs are sued in the federal district courts of Mississippi all of the

time. If sheriffs were employed by the state, all of those cases would be dismissed based on the Eleventh Amendment but that has never happened because in Mississippi, sheriffs are employees of the county and are considered to be acting on behalf of the county when in the performance of their official duties.

The Defendants cite a 2008 Mississippi Attorney General's opinion, No. 2008-00596, 2008 WL 5506410, 2008 Miss. AG LEXIS 380 (Dec. 19, 2008). That opinion states in part as follows:

> To specifically respond to your inquires this office is not aware of any specific statutory authority which states which law enforcement agency has superior authority nor is there any statutory authority which states that one law enforcement department has to share information with another. However, the Mississippi Supreme Court has stated in Smith v. State, 169 So.2d 451, 251 Miss. 241, (1964), that a "sheriff is the chief law enforcement officer of county ..."
>
> What this office would respectfully suggest is that a policy or at least an understanding be developed between the two departments as to the responsibilities each will assume when conducting law enforcement investigations or other operations within the municipal corporate limits.
>
> We opined in MS AG Op., Sowell (January 9, 1991): As previously noted, the sheriff has county wide authority while the chief of police is limited to the corporate limits of his municipality. Excepting Section 99-3-13, of the Mississippi Code of 1972. This office is not aware of any specific authority which provides that the chief of police or sheriff has superior authority when making arrest or investigating criminal activity within the corporate limits of a municipality. It appears to this office that the sheriff and chief of police enjoy concurrent jurisdiction over such criminal matters.
>
> CONCLUSION
>
> Ideally the sheriff and municipal police departments will cooperate in the investigation of crimes committed within municipal jurisdiction. However, the sheriff has the ultimate discretion to exercise his county-wide jurisdiction independently of municipal forces.

No. 2008-00596, 2008 WL 5506410, 2008 Miss. AG LEXIS 380 (Dec. 19, 2008) (emphasis added). [9] There is no authority whatsoever, then, that would have given Sheriff Darby the right to do what he did here which was to assault and arrest Chief Burdette (and detain Assistant Chief Pettis) in order to claim "his" witness Wilbourn.

What cannot be emphasized enough is that Wilbourn volunteered to be interviewed by Burdette and Pettis.[10] He is heard on the audio insisting that he will only speak to Pettis. Sheriff Darby did not have any authority to seize Wilbourn and, thus, no authority whatsoever to enter the Como Police Station and get Wilbourn and he certainly did not have the right to assault and then arrest Chief Burdette in an attempt to prove to everyone that his authority was superior power to that of Burdette's. Sheriff Darby could have insisted from one side of the county to another that Wilbourn speak to him and only him but he had **no** authority whatsoever to force Wilbourn speak to him. [11] It is clear, though, that this was Darby's objective when he tried to

---

[9] Ironically, the evidence before the Court is that the parties did have an agreement as to whether Panola County would assist Como in the investigation of crimes. Darby made it clear to Burdette that there was no way his office would assist Chief Burdette. *Clinton Memorandum Ex. D.*

[10] The Defendants' varying versions of the facts varies so far from what is known to be true, it makes it almost impossible to believe them about anything. For example, they state that "The Chief took a witness from the scene by force." *Defendants' Brief at. P. 10.* Nothing could be further from the truth.

[11] All police seizures of a person, including brief detentions, must be tested against the Fourth Amendment guaranty of freedom from unreasonable searches and ]seizures. U.S. Const. amend. IV; *Mapp v. Ohio*, 367 U.S. 643, 648, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). A warrantless seizure is considered per se unreasonable unless it falls within one of the few exceptions to the warrant requirement. A citizen is seized when his freedom of movement is restrained and she would not believe that she is free to leave or decline an officer's request to do something. An investigative stop/detention is an exception to the warrant requirement and is based upon less evidence than is needed for probable cause to make an arrest. *Terry v. Ohio*, 392 U.S. 1, 25-26, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). An investigative detention occurs when the police briefly seize a person for questioning based on specific and articulable, objective facts that give rise to a reasonable suspicion that the person has been or is about to be involved in a crime. *Terry*, 392 U.S. at 21. In this case, Wilbourn was cooperating with the investigation. Sheriff Darby had no right whatsoever to seize Wilbourn from Burdette.

take Wilbourn from Chief Burdette's vehicle and even more clear when you listen to the audiotape (*Defendants' Ex. Q*) made by Deputy Griffin just as she and Darby were about to enter the Como Police Station. Griffin says that they are going to talk to Burdette because he took one of their witnesses from the scene. Just before that you can hear Darby say "I may may may just have to be fixing to arrest him there." It isn't altogether clear whether he is saying he may have to arrest Wilbourn or Burdette but all of the statements uttered by Darby on the next minute or so of the tape are all about Burdette ("he tore off" with the witness; "he took off" with our witness). A jury could well conclude that when Sheriff Darby said he may have to arrest him at the police station, he was talking about Chief Burdette and, thus, that the plan to arrest Burdette was hatched prior to anything that happened at the Como Police Station. And, if the arrest was based on Burdette's having allegedly injured someone when he drove off with Wilbourn, either Griffin of Darby would have mentioned this in the beginning of the audio. At any rate, there is sufficient evidence just on the tape itself that a jury could conclude that Darby set off for the Como Police Station to arrest Burdette for taking Darby's witness and for no other reason. And there is no authority anywhere that would have allowed Sheriff Darby to do so much less that would allow Darby to assault Burdette in his anger over Burdette taking "his" witness.

Defendants cite no authority that would have given Sheriff Darby the right to insist that Wilbourn was his witness and not Chief Burdette's. Wilbourn was a witness and not a suspect. Wilbourn had taken it upon himself to call Assistant Chief Pettis and volunteer to make a statement. Wilbourn was not under arrest and Darby did not have an arrest warrant out for him. To the extent that Darby and his minions struck out for the Como Police Station in order to take Wilbourn by force and they assaulted Burdette and detained both Burdette and Pettis to do so, Burdette and Pettis are entitled to damages. And for the purpose of the Defendants' Motion for

Summary Judgment, the evidence is more than sufficient to support that this is what did in fact happen that day.

> 3. **Darby is not entitled to dismissal under the doctrine of qualified immunity for either unlawful arrest or excessive force.**

Public officials acting within the scope of their official duties are shielded from civil liability by the doctrine of qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 815-19, 102 S. Ct. 2727, 2736-38, 73 L. Ed. 2d 396 (1982). However, qualified immunity does not shield a public official whose conduct violates clearly-established constitutional rights, if a reasonable person would have known that such conduct was unconstitutional. *Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738. To establish that Darby is not entitled to qualified immunity, Plaintiffs must satisfy a three-pronged test. First, they must show that they have asserted a violation of a constitutional right. *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S. Ct. 1789, 1793, 114 L. Ed. 2d 277 (1992). Second, they must show that this right was clearly established at the time of Darby's actions. *Id.* at 233-34, 111 S. Ct. at 1794. Third, they must show that Darby's actions were objectively unreasonable. *Harlow,* 457 U.S. at 818, 102 S. Ct. at 2738.

A state or local officer is entitled to qualified immunity for a claim of wrongful arrest unless the officer lacked probable cause. *Eugene v. Alief Ind. School Dist.*, 65 F.3d 1299, 1305 (5th Cir. 1995). Whether the officer had probable cause depends on whether, at the time of the arrest, the facts and circumstances within his knowledge were sufficient to warrant a prudent man in believing that the individual arrested had committed or was committing an offense. *Piazza v. Mayne*, 217 F.3d 239, 245-46 (5th Cir. 2000).

The Plaintiffs' theory of this case is that Burdette was assaulted and both Burdette and Pettis were detained because Darby was angry that "his" witness, Tracy Wilbourn, had been driven from the scene by Burdette. There is evidence to support this theory of the case including

14

Sheriff Darby's announcement that "I may may be I may just have to be fixing to arrest him there" just before arriving at the station. The audiotape certainly does not resolve what really happened at the Como Police Station that afternoon. At any rate, if a jury believed that Sheriff Darby assaulted and arrested Burdette (and detained Pettis) because of a ridiculous turf war, Sheriff Darby would not be protected by qualified immunity.

4. **There is sufficient evidence of excessive force that the motion for summary judgment must be denied on that claim.**

Under the Fourth Amendment, the police may use only such force as objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989); *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000). Generally, excessive force cases are rarely decided as a matter of law because the Fourth Amendment test for reasonableness is inherently fact-specific. Excessive force claims are necessarily fact-intensive; whether the force used is "excessive" or "unreasonable" depends on "the facts and circumstances of each particular case." *Graham,* 490 U.S. at 396; see also *Brosseau v. Haugen*, 543 U.S. 194, 201, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (observing that this "area is one in which the result depends very much on the facts of each case"). Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. It should go without saying that where there is no need for force, any force used is constitutionally unreasonable. *P.B. v. Koch*, 96 F.3d 1298, 1303-04 & n. 4 (9th Cir. 1996). The issue of whether Sheriff Darby assaulted Chief Burdette for no cause other than that Darby was angry at Burdette for "stealing" his witness is one that is very much in dispute. Both sides have submitted affidavits in support of their version of what happened at the Como Police Station and the audiotape hardly settles the

issue. For this reason, summary judgment on the issue of excessive force is just not possible.

### D. CONCLUSION:

The Defendants claim that the arrest and force used against Chief Burdette and the detention of Pettis was reasonable because of Chief Burdette's actions. They claim that Burdette assaulted Darby and a deputy when he drove off with witness Wilbourn. This "fact" is disputed. They also claim that Chief Burdette's actions when Darby and his minions invaded the Como Police Station provided grounds on which to arrest Burette and detain Pettis. This, too, is disputed notwithstanding the existence of the audiotape. If anything, the audiotape seems to show that Darby drove to the Como Police Station with the intent to arrest Burdette for "stealing" "his" witness.

Sheriff Darby had made it clear to Chief Burdette that if Burdette became the Chief of Police of Como, Burdette could expect no assistance from Darby's office for investigating crimes occurring in the town of Como. Darby's office nonetheless showed up at the scene of a shooting in Como and Darby became enraged when Burdette "stole" "his" witness. He headed straight to the Como Police Station intending to wrest the witness from Chief Burdette even if it meant he had to arrest Burdette to make that happen. Darby had no authority whatsoever to do so and Burdette was beaten and both he and Assistant Chief Faye Pettis were wrongfully detained all because of a turf war. Given that all of the material facts are disputed, this is a case for the jury and as such, summary judgment must be denied.

This the 12th day of August, 2014.

                                          Respectfully submitted,

                                        EARL BURDETTE and
                                        CORNELIA FAYE PETTIS

                    BY: /s/ *Edward Blackmon, Jr.,*
                           Edward Blackmon, Jr. MS #3354

OF COUNSEL

Janessa E. Blackmon, Esq.
BLACKMON & BLACKMON, PLLC
907 West Peace Street
Post Office Drawer 105
Canton, Mississippi 39046
Telephone: 601-859-1567
Facsimile: 601-859-2311

## CERTIFICATE OF SERVICE

I, Edward Blackmon, do hereby certify that I have this day e-filed a true and correct copy of the above and foregoing with the Clerk of the Court which automatically served Daniel J. Griffith, Griffith and Griffith, Cleveland, Mississippi.

This the 12th day of August, 2014.

                BY: */s/ Edward Blackmon, Jr.*
                     ATTORNEY FOR PLAINTIFFS

Z:\oldFiles\PERSONAL.INJ\Earl Burdett\Plaintiff's Response to 8.11.14.doc